UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAM RAZO,

        Plaintiff,

    v.

TIMEC COMPANY, INC., et al.,

        Defendants.

Case No. 15-cv-03414-MEJ

**ORDER RE: MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 124, 131

## INTRODUCTION

Sam Razo (Razo) alleges his former employer TIMEC Company, Inc. (TIMEC) interfered with his rights under the California Family Rights Act of 1993 (CFRA), retaliated against him for taking CFRA leave, and constructively discharged him in violation of public policy, including violation of his rights under CFRA. First Am. Compl. ("FAC"), Dkt. No. 15; First Order re: Summ. J., Dkt. No. 69 (granting Defendants summary judgment on Razo's age- and disability-discrimination claims; granting former Defendant Transfield Services Ltd. summary judgment on all claims); Order re: Mot. for Leave to Amend, Dkt. No. 149 (memorializing Razo's abandonment of claims under Family Medical Leave Act after pretrial conference, and denying leave to amend to add additional theories of liability).[1]

Pending before the Court is TIMEC's Second Motion for Summary Judgment (Def.'s Mot., Dkt. No. 124) and Razo's First Motion for Summary Judgment (Pl.'s Mot., Dkt. No. 131). The Motions have been fully briefed, and the Court found these matters suitable for disposition without oral argument. *See* Dkt. No. 148; Fed. R. Civ. P. 78; Civ. L.R. 7-1(b).

---

[1] After the May 18, 2017 pretrial conference, the Court gave the parties leave to move for summary judgment on certain issues that could be resolved as a matter of law. *See* Order re: Pretrial Conf., Dkt. No. 116. These Motions were filed in response to that Order.

Having considered the parties' positions, the relevant legal authority, and the record in this case, the Court **GRANTS IN PART** TIMEC's Motion and **GRANTS IN PART** Razo's Motion for the following reasons.

### BACKGROUND

Reproduced below without citations are the material facts the Court discussed in its First Order re: Summary Judgment. *See* First Order re: Summ. J. at 2-10. Where the parties have identified new material facts in connection with the pending Motions, the Court discusses them below with citations to the record.

**A.      Razo's Career at TIMEC**

For approximately 25 years and until August 4, 2014, Razo worked for TIMEC. TIMEC provides maintenance services for oil refineries. The events relevant to Razo's claims occurred at a refinery operated by Chevron in Richmond, California (the "Richmond Chevron refinery").

TIMEC's records reflect that Razo worked as a pipefitter as late as the year 2000, but otherwise the records indicate Razo worked as a welder. In 2008, TIMEC promoted Razo to general foreman of TIMEC's "on-the-run" welder's group at the Richmond Chevron refinery. The on-the-run group was part of the maintenance division; it performed maintenance in emergency situations and without shutting down the machinery, i.e., while the machinery were "running." In 2014, Razo supervised the five to six welders that were assigned to the on-the-run group.

Razo did not receive any negative written performance evaluations while he held this position. On the contrary, for the year ending June 30, 2013, Razo either met or exceeded expectations on every objective listed on his Workforce Development Review Form. His manager wrote that Razo "[d]oes great with other[s;] teaches all he knows to others;" "[d]oes great on keeping the clien[t] satisf[ied];" is "[v]ery well respected by group and alot of people in the refinery;" and concluded that "Sam Razo is on top of his career and does very well on accepting new rules and changes." On November 13, 2013, Razo received a year-end rating of "meets expectations," and his manager noted that Razo "[s]erves well for me and the client." On August 4, 2014, Razo received only "satisfactory" or "very good" ratings on his evaluation; Johnny Gutierrez, his evaluator and TIMEC project manager, commented: "Sam does a good job."

Gutierrez testified that he gave Razo a satisfactory rating only "out of respect for the man" and that a "fair and honest evaluation" would have been lower. Rebuttal Johnston Decl., Ex. A at 256:3-257:4 ("I gave him a generic fair evaluation out of respect for the man, which is why I also put, 'Sam does a good job.'"), Dkt. No. 145.

Between October 2013 and prior to August 2014, Razo's direct TIMEC supervisor was Superintendent Gustavo Aguilar; Aguilar was in turn supervised by Gutierrez; and Gutierrez was supervised by TIMEC Site Manager Richard Holt. Kevin Taylor was the supervisor of the on-the-run group before Aguilar. Chevron personnel, including Jeffrey Sullenger and Daniel Bernardy, interacted with TIMEC and exercised authority over certain decisions relating to TIMEC's staffing decisions at the Chevron Richmond refinery.

**B.     TIMEC Demotes Razo**

Starting in late October 2013, Gutierrez began complaining to Holt that Razo was not performing the duties required of a general foreman. There is no evidence Gutierrez documented such complaints in writing. Gutierrez testified he observed Razo performing tasks appropriate for a lower-ranking materials expediter, not tasks appropriate for a general or craft foreman. Gutierrez also testified there was no need for a general foreman given the staffing levels and projects being staffed, and that maintaining Razo as general foreman was inefficient.

In March 2014, Gutierrez verbally recommended to Holt that Razo step down from his general foreman position to a craft foreman position. Although Holt believed Razo had worked well as the general foreman for the group, he nonetheless approved Gutierrez's recommendation that Razo be demoted from general foreman to craft foreman, and his pay lowered accordingly. Taylor, however, "did not understand the merit" of Gutierrez's complaints about Razo.

Also in March 2014, Razo informed Aguilar and Holt he would be taking time off to have eye surgery. Razo informed Holt he wanted to have surgery because his "eyelids were closing over, so he couldn't open his eyes fully." Aguilar and Holt both told Razo it was "fine" to take time off.

On April 7, 2014, Gutierrez emailed Holt, asking him to approve a Personnel Action Notice (PAN) demoting Razo to craft foreman and lowering his pay from $38 per hour to $35 per

3

hour.  The PAN, effective that day, shows Razo's position as general foreman earning $38 per hour and his new position as craft foreman earning $35 per hour.

The parties dispute whether TIMEC informed Razo he was being demoted before he went on his first leave of absence.  Gutierrez declares he informed Razo in March 2014 that he would be demoted from general foreman to craft foreman for performance and budgetary reasons.  Gutierrez wrote Holt that he and Razo "had the discussion you and I talked about.  He is good with the change.  He is at work today and will be taking the rest of the week off for personal business."  Razo denies Gutierrez ever informed him he was going to be demoted to craft foreman or told him that he was not performing duties consistent with the positions of general or craft foreman.

## C.    Razo's First Leave of Absence

As noted, Razo informed Holt and Aguilar in March 2014 he would need to go on medical leave to have eye surgery.  There is no evidence in the record when Razo informed anyone at TIMEC before his leave of absence that he would be going on leave specifically on April 8, 2014.

Razo started his first leave of absence on April 8, 2014, with an anticipated return date of April 30, 2014.  Carlos Cerda, TIMEC's Rule 30(b)(6) witness about the company's policies and procedures related to the Family and Medical Leave Act (FMLA), testified that Razo qualified for FMLA leave at that time.  On April 8, 2014, Kelly Teel, then Benefits Administrator for TIMEC's parent company in Houston, Texas, sent Razo an FMLA eligibility package containing paperwork, requesting Razo return the completed leave request form and WH-380 physician certification form no later than 15 days from the date of the letter.  Second Teel Decl. ¶¶ 3, 7 & Ex. A, Dkt. No. 128.

On April 14, 2014, Razo signed for delivery of the FMLA eligibility package Teel sent him.  *See id.* ¶ 9 & Ex. C (postal return receipt signed by Razo for the packet on April 14, 2014).  Teel declares Razo never returned any of the certification paperwork she issued on that day.  *Id.* ¶ 7.

A Work Status Report from Razo's physician dated April 9, 2014 placed Razo on medical leave and/or on modified activity through April 22, 2014.  Another Work Status Report dated April 29, 2014 extended Razo's medical leave and/or modified activity through that date.  The

4

1    Work Status Reports do not identify the date of onset of the condition, or how long the condition

2    is expected to last; they only state that Razo is being placed on modified activity or off work

3    through April 29th.  *See* Avloni Decl. (Dkt. No. 132), Ex. 8 at TIMEC324-325.  Razo testified he

4    provided paperwork from his doctor to Bonnie Morgan, TIMEC's HR representative in California,

5    in connection with this leave; he also testified he gave some doctor's notes to Holt.  There is no

6    evidence in the record establishing when Razo provided the April 9 and April 29 Work Status

7    Reports to TIMEC.[2]

8         There is no written evidence TIMEC informed Razo it was denying his request for FMLA

9    leave in connection with the first eye surgery.  During the hearing on Defendants' first Motion for

10   Summary Judgment, Defendants' counsel admitted that TIMEC had not sent Razo a letter

11   informing him it was denying his request for FMLA leave.

12        While he was on leave, Razo received a check showing TIMEC had changed his hourly

13   rate to $35 per hour.  On April 30, 2014, when he returned to work from his leave, Razo asked

14   Holt why his rate had changed.  Holt asked Chevron whether he could raise Razo's rate back to

15   $38 per hour and obtained approval to do so.  Razo's title returned to general foreman.  Holt told

16   Razo he would "be going back to the weld group and still be in charge of the welders."  On June 6,

17   2014, TIMEC issued an adjustment check to Razo paying him the $3.00 per hour difference for

18   the hours he had worked since April 30, 2014.

19   **D.    Razo's Second Leave of Absence**

20        In June 2014, Razo requested another medical leave because he did "not feel good."  On

21   June 5, 2014, Razo delivered a "doctor's note" in the form of a Work Status Report to Morgan.

22   The Work Status Report completed by Dr. Houston states the date of onset of the condition was

23   May 30, 2014, and that the patient was placed off work from that date through July 2, 2014.

24   Avloni Decl., Ex. 8 at TIMEC380.

25   ───────────────────────

26   [2] Morgan declares that Razo did not provide TIMEC with these two Work Status Reports.
     Morgan Decl. ¶ 5, Dkt. No. 143-11.  But Morgan also testified that she did not issue FMLA
27   paperwork to employees, as this was Teel's responsibility.  Johnston Opp'n Decl. (Dkt. No. 143),
     Ex. G at 14-15.  TIMEC has not established foundation for its apparent contention that the fact
28   Morgan did not receive the Work Status Reports means Razo did not provide them to anyone at
     TIMEC.  Indeed, TIMEC produced both documents in this litigation.

On June 19, 2014, Teel sent Razo an FMLA packet. Second Teel Decl. ¶ 10 & Ex. D. Razo never returned the certification paperwork she issued on that day. *Id.* ¶ 10.

Razo attempted to return to work on June 30, 2014 and again on July 14, 2014, but he did not have a medical release from his doctor authorizing him to do so. He returned to work on July 15, 2014. On July 18, 2014, TIMEC informed Razo it had denied his request for FMLA leave because he had not returned required paperwork to TIMEC, but that he would receive regular leave.

**E.     Razo's Third Leave of Absence**

The parties dispute when Razo informed TIMEC he would be taking a leave of absence in connection with his second eye surgery. Razo testified he provided information regarding the medical leave for this second eye surgery when he gave TIMEC the paperwork regarding his first surgery.

Holt testified he remembered that Razo told him about this third leave a few days before he was supposed to have his second surgery. Organ Decl. (Dkt. No. 138), Ex. 3 at 78:1-5. On July 23, 2014, TIMEC processed a PAN indicating it had received Razo's FMLA certification.

Only July 25, 2014, Teel sent Razo an FMLA packet in connection with his third request for leave. Second Teel Decl. ¶ 12 & Ex. F. Razo never returned that certification paperwork. *Id.* ¶ 12.

On July 10, 2014, Dr. Johl completed a Work Status Report placing Razo off work from July 18-25, 2014. Johnston Mot. Decl. (Dkt. No. 129), Ex. B at RAZO120. There is evidence this note was received by TIMEC no later than July 23, 2014, when TIMEC prepared a PAN showing Razo was on FMLA leave effective July 18, 2014. Organ Decl., Ex. 17 ("physician's certification received placing him off work from 7-18-14 through 7-25-14").[3] On July 29, 2014, Razo's physician completed a Work Status Report extending Razo's medical certification through August

---

[3] TIMEC argues it is undisputed Razo did not provide a July 10, 2014 Work Status Report from Dr. Johl to TIMEC until July 23, 2014. *See* Defs.' UMF Nos. 82-83, Dkt. No. 139 (includes Plaintiff's responses to UMF). At most, the evidence TIMEC identifies in support of these facts establishes that as of July 21, 2014, Morgan had not received a doctor's note from Razo in connection with this leave. *See* Morgan Decl., Ex. I.

United States District Court
Northern District of California

3, 2014. Avloni Decl., Ex. 8 at TIMEC560. Razo provided the July 29th note to TIMEC on July 31, 2014. Def.'s UMF No. 88 (undisputed). Dr. Johl's Work Status Reports do not identify the date of onset of Razo's condition.

Razo returned to work on August 4, 2014 after providing paperwork from his doctor certifying he was fit to do so. On Razo's first day back, Gutierrez asked him to accept a position as materials expediter, at $32 per hour. A materials expediter receives materials, picks up and delivers items, is accountable for keeping track of materials, drives a truck, and operates a forklift. Razo learned Collin Koutz, a younger TIMEC employee, had become a foreman for the piping and welding side of the on-the-run group; Plaintiff testified "somebody else had [his] spot." Gutierrez instructed Razo to "take care of the toolroom" then to work with one of the mechanics performing expediting duties. By 10:00 a.m., Razo asked Gutierrez, "[I]s this going to be this way, you know?" "[I]f this is going to continue," Razo stated, "I would rather be laid off." TIMEC laid Razo off at the end of that day.

On August 6, 2014, TIMEC offered Razo a position with the title of craft foreman, at the $35 per hour rate. Razo rejected the offer. He went to work for another company as a materials expediter approximately one month after leaving TIMEC.

**F.     TIMEC's Processing of Leave Requests**

The parties dispute whether and when Razo received paperwork from TIMEC regarding his leaves of absence. Teel testified she was "certain" she sent "all the appropriate paperwork" to Razo in connection with his three leaves, but the "true and correct" copies of the packets she attaches to her Second Declaration do not contain all the documents she declares are part of her standard eligibility packages. *Compare* Second Teel Decl., Ex. B (standard TIMEC FMLA packet) *with id.*, Ex. A (April 8th packet missing FMLA policy, designation notice, and leave form), Ex. D (June 5th packet missing FMLA policy and designation notice), Ex. F (July 25th packet, same, and also missing essential duties description).[4] Razo testified he does not remember

---

[4] Cook also testified she was not aware that any certificates of medical necessity had been sent to Razo, but Razo failed to establish foundation for her knowledge, and the Court sustains TIMEC's objection on that ground. *See* Organ Decl. Ex. 10 at 122:15-23.

receiving any paperwork from Teel. TIMEC produced a USPS receipt showing Razo signed for

the paperwork Teel sent him in connection with his first leave, but not for the other two leaves.

Razo testified he submitted notes from his doctors to Morgan in connection with each of

his leaves, but he did not recall giving her any other paperwork. *See* Organ Decl., Ex 9 at 65:7-17,

159:1-16, 236:17-23, 233:1-6, 234:7-11.[5]  As described above, TIMEC produced Work Status

Reports from Razo's physicians in connection with his three leave requests. *See also* Avloni

Decl., Ex. 8 (work status reports produced by TIMEC that show Razo's doctors placed him on

leave 4/8/14-4/15/14, 4/15/14-4/29/14, 5/30/14-7/2/14, and 7/18/14-8/3/14); *see also* Organ Decl.,

Ex. 34 (Pl.'s Opp'n Morgan Dep.) at 21:5-14 (remembering Razo's physician certifications from

Kaiser, but not FMLA paperwork).

## LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

that there is "no genuine dispute as to any material fact and [that] the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment

bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that

demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986). Material facts are those that may affect the outcome of the case. *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is

sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

Where the moving party will have the burden of proof on an issue at trial, it must

affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where

the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by

pointing out to the district court that there is an absence of evidence to support the nonmoving

---

[5] In response to TIMEC's UMF No. 76 ("Razo never returned the information"), Razo asserts he "submitted all requested paperwork related to his FMLA and CFRA leaves." None of the deposition excerpts Razo cites supports this proposition. In addition, page 182 of the Razo Deposition is not attached to any declaration filed in connection with these two motions, but it was provided in connection with the first Motion for Summary Judgment.

party's case. *Celotex*, 477 U.S. at 324-25.

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 250. All reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). However, it is not the task of the Court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The Court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.*; *see also Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010). Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). If the nonmoving party fails to make this showing, the moving party is entitled to a judgment. *See Celotex*, 477 U.S. at 323.

## DISCUSSION

TIMEC moves for summary judgment on (1) Razo's request for punitive damages, (2) Razo's CFRA claims generally, and separately as they relate to Razo's first leave of absence; and (3) Razo's constructive discharge claim. Razo asks the Court to grant him summary judgment and find that (1) his claims are not preempted by the Labor Management Relations Act (LMRA); (2) his alleged failure to produce a fitness-for-duty certification does not provide a basis for his termination; (3) he timely exhausted his administrative remedies; and (4) he had the requisite number of hours and length of employment to qualify for CFRA leave.

**A.    Preemption**

In its Fourteenth Affirmative Defense, TIMEC asserts that Razo's claims are preempted by the LMRA. The Court previously denied TIMEC summary judgment on this ground. First Order re: Summ. J. at 19 (finding Razo's state law claims were not preempted because they could be resolved without interpreting the CBA). Razo now moves for summary judgment as to this affirmative defense. *See* Pl.'s Mot. at 3-5.

1.    Applicable Law

Section 301 of the LMRA, 29 U.S.C. § 185(a), preempts state law claims "founded directly on rights created by [CBAs], and claims substantially dependent on analysis of [a CBA]." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987). "The plaintiff's claim is the touchstone for this analysis; the need to interpret the CBA must inhere in the nature of the plaintiff's claim." *Cramer v. Consol. Freightways Inc.*, 255 F.3d 683, 691 (9th Cir. 2001) (en banc). A state law claim is "substantially dependent" on a CBA if it "cannot be resolved without interpreting the applicable CBA." *Id.* The fact a CBA will be "consulted in the course of state law litigation does not require preemption." *Id.* at 690-91; *see also Detabali v. St. Luke's Hosp.*, 482 F.3d 1199, 1203 (9th Cir. 2007) ("A reference to or consideration of the terms of a collective bargaining agreement is not the equivalent of interpreting the meaning of the terms." (internal quotation marks and citation omitted)).

2.    The Parties' Arguments

TIMEC concedes Razo's CFRA and constructive discharge claims exist independently of the CBA. Def.'s Opp'n at 9, Dkt. No. 140. TIMEC argues the claims are nonetheless preempted because the Court will need to interpret the CBA to resolve the following allegations relevant to his retaliation and interference claims: Razo was demoted while he was on his first medical leave (FAC ¶ 20); he was stripped of seniority and again demoted, this time to a materials expediter position (*id.* ¶ 22), he asked for and receive a "layoff" (*id.*); he refused the offer of a craft foreman position (*id.*); TIMEC "regularly decreas[ed his] salary, demot[ed] him and replac[ed] him with a younger and substantially less experienced employee (*id.* ¶ 24); and as a result of TIMEC's conduct, Razo incurred lost wages, seniority bonuses, and health care benefits (*id.* ¶ 25 & Prayer for Relief). Def.'s Opp'n at 10.[6] Defendant also argues that Razo's claims are preempted to the extent he seeks future economic loss in the form of wages and seniority bonuses, because the Court will need to interpret the CBA to determine whether Razo qualified for these payments. *Id.*

---

[6] The Court granted summary judgment to Defendant on Razo's age- and disability-based discrimination claims because Razo failed to identify a genuine issue of fact as to these claims. *See* First Order re: Summ. J. at 19-30.

10

at 12.

3. <u>Analysis</u>

i. *Preemption of Claims*[7]

Razo's constructive discharge claim is based, in part, on Defendant's violation of California public policy – including interference with, and retaliation for, Razo's rights under CFRA. *See* FAC ¶¶ 14-21, 23-24, 33, 53, 84. A constructive discharge claim based on violation of public policy is not preempted "if it poses no significant threat to the collective bargaining process and furthers a state interest in protecting the public transcending the employment relationship." *Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 1001-02 (9th Cir. 1987). Such a claim *is* preempted "if it is not based on any genuine state public policy . . . or if it is bound up with the interpretation of the [CBA] and furthers no state policy independent of the employment relationship." *Id.* Razo's claims of interference with (and retaliation for taking advantage of) a right to medical leave provided by California law further (1) a state interest in protecting the public and transcending the employment relationship and (2) a state policy independent of the employment relationship. *See Faust v. Cal. Portland Cement Co.*, 150 Cal. App. 4th 864, 886 (2007) (rights afforded by CFRA embody California public policy). As such, Razo's constructive discharge claim is not preempted by the LMRA.

The gravamen of Razo's retaliation claim is that TIMEC took an adverse employment action against him because he took or requested medical leave to which he was entitled under CFRA. TIMEC argues that a trier of fact will need to analyze whether it was reasonable for Koutz to be placed in charge of the on-the-run group in order to evaluate whether Razo's working conditions were so intolerable that a reasonable person would have quit, which would require the trier of fact to interpret the CBA. Def.'s Opp'n at 13. The Court disagrees: a trier of fact would only need to find that TIMEC placed Koutz in charge of the group in retaliation for Razo's requesting or taking CFRA leave. Whether TIMEC can justify the adverse action based on the

---

[7] TIMEC does not appear to be arguing that Razo's interference claim, to the extent that claim is based on failure to provide and/or misclassification of medical leave as personal leave, is preempted. *See* Def.'s Opp'n. To the extent TIMEC does argue this, the Court finds no indication the fact finder would need to interpret the CBA to analyze this claim.

CBA is not dispositive to this claim, which ultimately rests on the motive behind TIMEC's conduct. In deciding that Section 301 did not preempt an employee's retaliatory discharge claim under Illinois state law, the Supreme Court explained:

> [T]o show retaliatory discharge, the plaintiff must set forth sufficient facts from which it can be inferred that (1) he was discharged or threatened with discharge and (2) the employer's motive in discharging or threatening to discharge him was to deter him from exercising his rights under the Act or to interfere with his exercise of those rights. . . . Each of these purely factual questions pertains to the conduct of the employee and the conduct and motivation of the employer. Neither of the elements requires a court to interpret any term of a collective-bargaining agreement. To defend against a retaliatory discharge claim, an employer must show that it had a nonretaliatory reason for the discharge . . .; this purely factual inquiry likewise does not turn on the meaning of any provision of a collective-bargaining agreement. Thus, the state-law remedy in this case is "independent" of the collective-bargaining agreement in the sense of "independent" that matters for § 301 pre-emption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement.

*Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988) (internal quotation marks and citations omitted). Even if the CBA refers to a similar right as that provided by substantive state law, the Supreme Court held the claim is not preempted as long as it can be litigated without reference to the CBA: "[T]he mere fact that a broad contractual protection against discriminatory—or retaliatory—discharge may provide a remedy for conduct that coincidentally violates state law does not make the existence or the contours of the state law violation dependent upon the terms of the private contract." *Id.* at 412-13.

Razo's CFRA retaliation claim requires him to establish (1) TIMEC was an employer covered by CFRA; (2) Razo was an employee eligible to take CFRA leave; (3) Razo exercises his right to take leave for a qualifying purpose; and (4) he suffered an adverse employment action because he exercised that right. *See Faust*, 150 Cal. App. 4th at 885 (citing *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005)). Upon Razo establishing a prima facie case, TIMEC must offer a legitimate, non-retaliatory reason for the adverse employment action. *See id.* If TIMEC does so, the burden shifts back to Razo to prove intentional retaliation. *See id.* Thus, even if TIMEC could show its actions were permitted by the CBA, Razo could still offer evidence the adverse employment action was motivated by TIMEC's impermissible retaliation for taking

CFRA leave.  *Id.*  Because the fact-finder would not need to interpret the CBA to analyze Razo's evidence of pretext, his retaliation claim is not preempted.

>   ii.    *Preemption of Types of Relief*

TIMEC separately argues that some of Razo's requested damages Razo are remedies created solely by the CBA: damages for past and future lost wages, loss of seniority bonuses and health care benefits.  Def.'s Opp'n at 11-12.  (The Court separately addresses TIMEC's arguments regarding punitive damages below.)  Because Razo's entitlement to such relief can only be determined by an interpretation of the CBA, TIMEC argues this type of damage is preempted.  *Id.* Case law analyzing preemption focuses on the preemption of "claims" and "causes of action" (*see, e.g., id.* at 9).  Generally, the need to examine a CBA to determine the rate of pay, or other such undisputed factors relevant to a damage analysis, does not preempt claims.  *See Livadas v. Bradshaw*, 512 U.S. 107, 125 (1994) ("There is no indication that there was a 'dispute' in this case over the amount of the penalty to which Livadas would be entitled, and *Lingle* makes plain in so many words that when liability is governed by independent state law, the mere need to 'look to' the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by § 301." (citing *Lingle*, 486 U.S. at 413 n.12)).  Here, TIMEC disputes the amount of the penalty to which Razo would be entitled should he prevail.  But TIMEC cites no authority for the proposition that a specific type of relief—as opposed to an entire claim—can be preempted.  *See* Def.'s Opp'n at 10-12.

>   4.    Summary

The Court once again finds that Section 301 does not preempt Razo's state law claims because the fact finder will not need to interpret the CBA in order to determine whether TIMEC interfered with his leave by denying it or misclassifying it; retaliated against Razo for taking or requesting medical leave; or from made his work conditions so intolerable that a reasonable person would quit.  As a result, the Court **GRANTS** Razo's Motion for Summary Judgment as to TIMEC's Fourteenth Affirmative Defense to the extent it applies to Razo's state law claims.

The Court does not decide at this juncture whether the LMRA preempts particular types of relief because the parties have not sufficiently addressed this issue.  If Razo intends to seek such

relief at trial, TIMEC may revisit the issue in its trial brief.

**B.      Entitlement to Leave**

Razo asks the Court to grant him summary judgment on the issue that he had the number of hours and length of employment required to entitle him to CFRA leave throughout the four month period that he requested his leaves. *See* Pl.'s Mot. at 11-12. TIMEC responds (Def.'s Opp'n at 16), and the Court agrees, that Razo bears the burden of establishing his entitlement to each of his leaves. *See supra*.

1.      Requisite Hours and Length of Employment

TIMEC informed Razo he was eligible for FMLA[8] leave at the beginning of each of his three leaves. *See* Avloni Decl., Ex. 14 at TIMEC820 (Notice of Eligibility for Leave stating Razo is eligible for leave beginning on April 7, 2014); *id.* at TIMEC831 (Notice of Eligibility for Leave stating Razo is eligible for leave on May 30, 2014); *id.* at TIMEC849 (Notice of Eligibility for Leave stating Razo is eligible for leave beginning on July 18, 2014). Cerda testified Razo qualified for FMLA leave on April 8, 2014. Avloni Decl., Ex. 3 at 42:10-20. Teel testified Razo was eligible for leave on April 8, 2014; June 19, 2014; and July 25, 2014. Avloni Decl., Ex. 6 at 66:1-5.

But a triable issue of fact exists whether TIMEC actually granted Razo protected leave and deducted that time from the amount of leave to which Razo was entitled. There is no evidence TIMEC denied Razo's first request for medical leave; on the contrary, Razo identified evidence that TIMEC granted him protected leave for his first eye surgery. *See* Organ Decl., Ex. 11 at TIMEC337 (Holt email stating Razo returned from FMLA time off on April 30th); *id.*, Ex. 3 (Holt Dep.) at 123:12-25 (Holt "probably" would not have written that if Razo had not been on FMLA time off). It is undisputed that TIMEC denied his second requests for medical leave. *See* Organ Decl., Ex. 15 (July 18, 2014 letter from Kelly Teel stating: "Dear Sam, The request for FMLA leave is being denied as the required paperwork was never returned."); *see also* Def.'s UMF No.

---

[8] The parties apparently do not dispute that the CFRA hours and length of employment differ under the FMLA and the CFRA. TIMEC's witnesses mostly testified about the FMLA and Razo's requests for FMLA leave. Unless otherwise noted, references to the FMLA will apply with equal force to the CFRA.

United States District Court
Northern District of California

77 (undisputed that Teel informed Razo his second request for medical leave was denied). Other documents suggest Razo was granted his third request for leave, when he took time off in connection with his second eye surgery, and that it was TIMEC's policy to designate leave as protected regardless of whether an employee turned in the requested paperwork. *See* Organ Decl., Ex. 17 (designating Razo leave as FMLA leave on PAN form); *id.*, Ex. 10 (Pl.'s Cook Dep. at 42:1-21 ("He had not filled out the paperwork, but that's not required. The company was aware that he was going out in advance. I verified that, that they were notified. . . . And regardless of the paperwork, his having it filled out by his doctor, the certificate of eligibility, it doesn't matter. There was sufficient evidence that supported that this was protected leave, which is why I worked to reinstate him.").

While Teel confirmed Razo was eligible for leave "that whole four-month time period", she clarified that Razo "had never returned any[ leave forms], so we never counted any leave against FMLA in any of the leaves. So each time, we sent another packet letting him know he was eligible." Avloni Decl., Ex. 6 at 66:6--12. Razo thus has not established he was eligible for medical leave for the length of time he is claiming in this lawsuit, only that he was eligible at the beginning of each leave period based on TIMEC's classifications of his prior leave(s). A triable issue of fact exists whether Razo was or would have been eligible for medical leave for the duration of each of his three leaves if he had actually been provided with medical leave by Defendant each time he requested leave.

Razo's Motion for Summary Judgment on this issue is **DENIED**.

## 2. Failure to Return Fitness for Duty Form

It is undisputed that Razo was sent home on June 30, 2014 when he tried to return from his second leave of absence because he did not have the required paperwork from his doctor releasing him to work. *See* Def.'s UMF No. 78. Razo moves for summary judgment as to the legal effect of his failure to provide a fitness for duty certification from his doctor:

> Defendant has not provided any documents, testimony or discovery responses showing Razo was terminated because he was asked, and failed to return, a fitness-for-duty certification from his doctor. (Avloni Dec. ¶ 5.) Razo presumes Defendant intends to include this defense to include dozens of non-relevant exhibits about Razo's

medical leave to distract the jury. (Amended Joint Trial Exhibit List, Docket No. 112.).

Pl.'s Mot. at 7-8. TIMEC responds this argument is irrelevant, as it is TIMEC's contention Razo quit or was granted a lay off – not terminated. Def.'s Opp'n at 13.

In addition, Razo argues TIMEC could not demand a fitness for duty statement unless it included a written request for such a statement in its notice of eligibility for medical leave. Pl.'s Mot. at 7-8 (citing 29 C.F.R. § 825.300(d)(3)).[9] This section provides that:

> If the employer will require the employee to present a fitness-for-duty certification to be restored to employment, the employer must provide notice of such requirement with the designation notice. . . . If the employer handbook or other written documents (if any) describing the employer's leave policies clearly provide that a fitness-for-duty certification will be required in specific circumstances (e.g., by stating that fitness-for-duty certification will be required in all cases of back injuries for employees in a certain occupation), the employer is not required to provide written notice of the requirement with the designation notice, but must provide oral notice no later than with the designation notice.

TIMEC's FMLA Policy, which is attached to the Employee Handbook, articulates the same requirement. Avloni Decl., Ex. 4 at TIMEC254-262. The policy provides that "[a]n employee who takes leave under this policy may be asked to provide a fitness for duty (FFD) clearance from the health care provider that the employee is medically able to resume work and to perform the essential duties of his or her job. This requirement will be included in the employer's response to the FMLA request." *Id.* at TIMEC260. The policy further states that "[f]ailure to furnish a fitness-for-duty certification of the employee's ability to return to work . . . may result in the delay of job restoration or the termination of the employee." *Id.*

There is no evidence that any of the three eligibility packets Teel mailed to Razo contained a notice informing Razo that TIMEC would require a fitness-for duty certification. *See* Avloni Decl., Ex. 5. TIMEC attempts to create a triable issue by citing Teel's testimony that she is

---

[9] CFRA adopts the language of the FMLA. Razo may rely on the FMLA to analyze his CFRA claims as long as CFRA and the FMLA are not inconsistent on the relevant issue. *See Kappelman v. City & Cty. of S.F.*, 2015 WL 6471184, at *5 (N.D. Cal. Oct. 27, 2015) (citing *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 n.4 (9th Cir. 2003)); *see also* 2 Cal. Code Regs. § 11096 ("To the extent that they are within the scope of Government Code section 12945.2 and not inconsistent with this article, other state law, or the California Constitution, the Council incorporates by reference the federal regulations interpreting FMLA that became effective March 8, 2013.").

"certain" she sent all appropriate paperwork to Razo in connection with each of his leaves. *See* Johnston Opp'n Decl., Ex. Q (Teel Dep.) at 59:9-15, Dkt. No. 143. Teel's own declaration contradicts this argument: the only place where the fitness-for-duty certification requirement appears is a separate form entitled "Designation Notice (FMLA)" that Teel declares is part of the standard FMLA packet. *Se* Second Teel Decl., Ex. B. This blank form shows that the employer can check, "if applicable", that the employee "will be required to present a fitness for duty certification to be restored to employment." *Id.* at TIMEC1103. But none of the leave eligibility packets Teel declares are "true and correct" copies of the packets she sent Razo included a Designation Notice (FMLA) Form, nor did Teel's cover letters listing the documents included in the packets reference a Designation Notice (FMLA) Form. *See* Second Teel Decl. ¶¶ 7, 10, 12 & Exs. A, D, F. There accordingly is no evidence that Teel sent Razo a Designation Notice (FMLA) Form in connection with any of his leaves, much less that the box indicating fitness-for-duty certifications would be required was checked in the documents sent to Razo.

TIMEC does not respond to the merits of Razo's argument, or the evidence he offers in support of it. *See* Def.'s Opp'n at 13-14. Instead, it responds with an unsupported assertion that Razo had knowledge of TIMEC's policies on this point, and that Razo's argument defies logic as Razo should be well aware of the potential risks to his fellow employees if he returned to work unfit. *Id.* Razo's knowledge of the policy is not relevant to his argument that TIMEC could not demand a fitness for duty clearance unless it included this requirement in its eligibility packet and could not base any alleged adverse employment action on his failure to do so. It is also irrelevant that Razo should have known of the risks of returning to work unfit. This is insufficient to create a triable issue of fact.

Razo's Motion is **GRANTED** insofar as it concerns any defense that Razo's failure to return the fitness for duty certification from his doctor provided a legal basis for his termination, or any other adverse employment action (e.g., not paying him for the resulting delay in job restoration). This Order does not preclude TIMEC from presenting evidence regarding fitness-for-duty certifications if they are relevant to some other issue in dispute.

3. <u>Provision of Eligibility Notice</u>

Razo argues TIMEC interfered with his rights under CFRA[10] because it did not send him a notice of eligibility for medical leave within five business days of the time he informed Holt that he needed to go out on medical leave. *See* Pl.'s Mot. at 11-12. The Court denied Razo's Motion for Leave to Amend the Complaint to add allegations that "Defendant . . . failed to provide adequate notice to RAZO. Defendant failed to timely provide Razo with required information related to taking protected medical leave." Order re: Mot. for Leave to Amend at 3-6. This claim is not a part of the action, and the Court accordingly **DENIES** Razo's Motion for Summary Judgment on this issue.

    4.    <u>Whether Razo Was on Protected Leave</u>

TIMEC moves for summary judgment on the ground that Razo was not on protected leave. Def.'s Mot. at 17-21. TIMEC also argues Razo did not return the required medical certifications to support his request for medical leave, that TIMEC was not under an obligation to follow-up with Razo when he failed to do so, and that the Work Status Reports Razo did provide were not adequate CFRA medical certifications. *Id.*

First and foremost, triable issues of fact exist as to whether TIMEC denied more than one of Razo's requests for leave. It is *not* undisputed that TIMEC denied his first and third requests. *See supra*.

Second, it is undisputed that Razo provided Work Status Reports to TIMEC in connection with his three medical leaves. TIMEC nevertheless argues Razo's Work Status Reports were inadequate to establish his entitlement to medical leave because they did not contain the information requested by TIMEC. *See* Def.'s Mot. at 17. Medical certifications "shall be sufficient" under CFRA if they contain the date the employee's health condition started, the likely duration of the condition, and a statement the employee is unable to work due to the condition. *Lonicki v. Sutter Health Cent.*, 43 Cal. 4th 201, 211 (2008) (analyzing Cal. Gov't Code § 12945.2(k)(1)). If the employer has reason to doubt the validity of the certification, it can request a second or third medical opinion; it also can order the employee to return to work, and it can

---

[10] Razo also continues to argue TIMEC violated his rights under the FMLA after he abandoned FMLA-based claims. *See* Pl.'s Mot. at 11-12.

terminate the employee for failing to report to work. *Id.* at 208-210. If an employer chooses not to request a second or third medical opinion, Section 12945.2(k)(1)

> limits an employer's right, in litigation arising out of an employee's medical leave request, to claim that the employer acted reasonably because the information provided by the employee was inadequate: If an employer fires an employee who has given the employer a facially valid certification in support of a request for medical leave and the employee then sues for violation of the CFRA, the employer may not defend the suit by asserting that the employee, when requesting leave, provided insufficient evidence that the employee fell within the provisions of the CFRA.

*Lonicki*, 43 Cal. 4th at 211. Of course, the employer may defend the suit by asserting the employee did not suffer from a serious health condition. *Id.* at 212. While TIMEC may be correct that under the CFRA regulations in effect at the time Razo applied for his leave, it did not have any obligation[11] to follow-up with Razo when he failed to return the CFRA forms (*see* Def.'s Mot. at 18; Johnston Mot. Decl., Ex. L § 11091(pre-July 2015 CFRA Regs.)); under *Lonicki*, CFRA prevents TIMEC from using insufficiency of the Work Status Reports as a defense where it did not request a second medical opinion.

Third, TIMEC was entitled to require Razo to provide a medical certification to support his eligibility for leave. *See* Cal. Gov. Code § 12945.2(k)(a). But as described above, genuine disputes exist as to whether TIMEC sent Razo all required documentation for his medical leave requests, and whether it sent him FMLA packets at all in connection with his second and third leaves. It is in those FMLA eligibility packets that TIMEC would have requested the medical certifications. As such, there is a dispute as to whether TIMEC in fact requested medical certifications in connection with his second and third medical leaves, thereby triggering Razo's obligation to provide such documents. As dispute also exists as to when Razo provided the Work Status Reports to TIMEC in connection with his first leave. It is, however, undisputed that he provided the Work Status Reports supporting his second and third requests for leave before TIMEC sent him the FMLA eligibility packets, and the Work Status Report extending his third

---

[11] Regardless of what legal obligation TIMEC may have had to do so, Cerda testified it was TIMEC's practice to follow-up when employees did not return their forms. *See* First Order re: Summ. J. at 10.

19

leave by six days after TIMEC sent the third eligibility packet.  The Court cannot find the Work

Status Reports, assuming they qualify as medical certifications for CFRA purposes, were untimely

on this record.

Finally, despite the plain language of Section 12945.2(k)(1) and the California Supreme

Court's analysis in *Lonicki*, TIMEC argues that Razo could only comply with the CFRA

certification requirements by completing the specific Department of Labor's WH-380 Form

TIMEC asked him to complete.  *See* Def.'s Mot. at 17.  CFRA regulations in effect at the time

Razo applied for his leave explicitly permitted an employer to use the WH-380 Form that Teel

testified she mailed Razo in connection with each of his leaves.  Def.'s Mot. at 17 (citing 2 Cal.

Code Regs. tit. 2, § 11098 (pre-July 1, 2015) version); Johnston Mot. Decl., Ex. L at 31-36 ("For

leaves involving serious health conditions, the employer may utilize the following Certification of

Health Care Provider form or its equivalent.  Employers may also utilize any other certification

form, such as the [U.S.] Department of Labor Form WH-380 . . . so long as the health care

provider does not disclose the underlying diagnosis . . . without the consent of the patient.").  But

TIMEC cites no support for its contention that Razo could comply with the medical certification

requirements of CFRA only by returning the WH-380 Form.

In fact, a California Court of Appeal found the same Kaiser Work Status Reports which

Razo provided to TIMEC were sufficient as CFRA certifications.  In *Bareno v. San Diego*

*Community College District*, the California Court of Appeal examined a "Work Status Report . . .

form regularly used by Kaiser Permanente for the purposes of informing employers that

employees need time off from work or altered work arrangements due to medical necessity."  7

Cal. App. 5th 546, 569 (2017).  The form the employee had provided stated the date of onset of

her condition.[12]  *Id.*  Although the physician completing the form did not specifically write the

---

[12] Unlike the Work Status Reports described in *Bareno*, the Work Status Reports Razo provided to TIMEC in connection with his first and third medical leaves do not indicate the date of onset of his condition; Dr. Houston's Work Status Report does.  It is undisputed that Razo told Holt that he needed time off to have eye surgery, and that Razo told Holt this before each leave hat he would be taking time off.  Razo also testified he gave Morgan a note from Dr. Johl that indicated the dates for each of his two eye surgeries.  It is also undisputed that Cook, TIMEC's former Regional HR Manager, testified that she verified that TIMEC was notified Razo was going out on leave "in advance" and that "regardless of the paperwork" there was "sufficient evidence that supported that

20

expected duration of the condition or state that the doctor believed a leave of absence was

necessary, the Court of Appeal found that by placing the patient "off work" for seven days, the

form

> provides both the probable duration of [the] condition, as well as an
> indication to the employer that the doctor believes that a leave of
> absence from work is necessary. In other words, the clear intention
> of this document is to inform [the] employer that she cannot fulfill
> the functions of her job and needs the identified time off in order to
> address a serious medical condition. The information provided on
> the standardized Kaiser Permanente form is sufficient to meet the
> standards set forth by CFRA.

*Id.* And if the employer "did not believe [the] certification was sufficient, it could have requested

additional information . . . ; CFRA envisions exactly this kind of give-and-take between an

employer and an employee. [The employer] did not at any point indicate to [the employee] that it

viewed [the] documentation to be insufficient or seek additional information." *Id.* at 571. Given

these facts, the Court of Appeal found the employer was not entitled to summary judgment on the

ground that the medical documentation was inadequate, as a matter of law, to constitute the

exercises of a right to CFRA-qualifying leave. *Id.*

TIMEC argues *Bareno* is distinguishable because in that case, the employer had previously

accepted "a virtually identical form . . . as sufficient" and the Court of Appeal found "one could

readily conclude from this record that [the employer] believed that an identical or similar form

was sufficient to support" the claim for leave for an earlier period. *Id.* at 570. This was the

second, independent, basis the Court of Appeal offered in support of its finding the Work Status

Reports were sufficient, not the only basis. On the contrary, the Court of Appeal plainly stated

that the "information provided on the standardized Kaiser Permanente form is sufficient to meet

the standards set forth by CFRA." *Id.* Moreover, it is not undisputed that TIMEC did accept the

Work Status Reports as sufficient certifications in connection with Razo's first and third leaves. If

a trier of fact were to conclude TIMEC did grant those requests for covered leave, then *Bareno*

cannot be distinguished on this ground.

---

this [third leave] was protected leave" under federal guidelines. Pl.'s Cook Dep. at 42:1-21.
TIMEC cites no case supporting the proposition. The Court cannot find, that, as a matter of law,
that the failure to indicate the "onset date" of a planned surgery of which the employer is aware,
renders a medical certification insufficient.

Finally, TIMEC argues that, "to the extent it stands for the proposition that vague statements on a Work Status Report are sufficient for CFRA certification purposes," *Bareno* is wrongly decided. Def.'s Reply at 11, Dkt. No. 144. The Court does not agree with TIMEC's characterization of *Bareno*; instead, it finds *Bareno* stands for the proposition that an employer should look to the "clear intention" of the certifying physician rather than apply formalistic standards when assessing the sufficiency of a CFRA medical certification. In other words, the Court of Appeal focused on the substance of the document, rather than its form. Moreover, if in doubt, the employer can request more information – which TIMEC did not do.

The Court finds triable issues of fact exist regarding (1) whether Razo was on protected leave in connection with his first and third leaves; (2) the adequacy of the Work Status Reports as CFRA certifications; and (3) whether Razo received paperwork from TIMEC that he did not complete, and if so, the impact of that failure. Accordingly, the Court **DENIES** TIMEC's Motion for Summary Judgment on the issue of whether Razo was on protected leave.

### 2.    Restoration to Equivalent Position upon Return

TIMEC argues that Razo would not have held his position of general foreman or craft foreman even if he had not taken leave. Def.'s Mot. at 22. TIMEC argues Gutierrez made the decision to demote Razo before he went on leave based on his performance and that Razo's general foreman position was no longer available to Razo when he returned because the position had been eliminated when TIMEC restructured the on-the-run welder's group. Def.'s Mot. at 22.

The Court already rejected the first argument. *See* First Order re: Summ. J. at 34-37. The Court continues to find that a reasonable trier of fact could reject Gutierrez's testimony based on the lack of TIMEC's written documentation about any of Razo's alleged performance issues, and Razo's identification of numerous instances in the record where TIMEC and Chevron personnel praised his performance as general foreman. The validity of Gutierrez's evaluation that Razo was performing inadequately as a craft foreman is also cast into doubt by the fact TIMEC offered Razo a craft foreman position at $35 per hour several days after the demotion to materials expediter. The Court also continues to find a triable issue of fact exists as to the restructuring of the on-the-run group at the Chevron Richmond facility. The August 2014 restructuring does not explain the

22

April 2014 demotion, nor does it explain Razo's demotion from foreman to materials expediter. Moreover, a reasonable trier of fact could conclude, based on the fact that Razo was demoted repeatedly when he went on leave, that TIMEC impermissibly considered Razo's leaves as a factor in imposing the adverse consequences Razo experienced  upon return from his first and third leaves.  *See Xin Liu*, 437 F.3d at 1137 ("[P]roximity in time between the leave and her termination also provides supporting evidence of a connection between the two events.").

The Court finds genuine issues of material fact exist as to whether Razo would have kept his position as general foreman (or an equivalent position) if he never went on leave.

### 3. Conclusion

For the foregoing reasons, the Court **DENIES** TIMEC's Motion for Summary Judgment on Razo's CFRA claims.

## C. Failure to Exhaust[13]

In order to exhaust his administrative remedies and file suit, Razo had to file a charge with the California Department of Fair Employment and Housing (DFEH) within one year of the incident forming the basis of his claims.  Cal. Gov. Code § 12960.  On April 9, 2015, Razo filed a charge, complaining that "[o]n or around August 4, 2014" TIMEC discriminated, harassed, retaliated, demoted him, denied family care or medical leave, denied reinstatement, and forced him to quit.  Avloni Decl., Ex. 12 at ECF p.16 (DFEH charge).  He also complained that his "employer demoted me and decreased my salary as soon as I went on medical leave."  *Id.* at ECF p.18.

TIMEC argues the April 9, 2015 charge was untimely because Razo discovered the allegedly retaliatory decrease in salary "as soon as [he] went on medical leave" on April 8, 2014, and because Gutierrez told him about the demotion prior to that date.  Def.'s Mot. at 15 (citing DFEH charge); *see also* Johnston Mot. Decl., Ex. D (Gutierrez Dep.) at 96:24-99:21 (testifying he had a conversation with Razo before he left for his first medical leave, that he told Razo he was

---

[13] Razo also moves for summary judgment on Defendant's affirmative defense that Razo failed to exhaust his remedies under the CBA.  Pl.'s Mot. at 6-7.  Defendant did not respond to this argument.  *See* Def.'s Opp'n; Pl.'s Reply at 7 ("Defendant cannot prevail on its thirteenth affirmative defense that Razo failed to exhaust remedies under the CBA."), Dkt. No. 147.

not meeting the expectations he had for a general foreman, and that Razo agreed that he would try to take more of a leadership role); *see also id.*, Ex. E (Holt Dep.) at 92:13-93:13 (testifying Razo told Holt before taking his first leave in April 2014 that he had decided to take the demotion to craft foreman). But Razo testified he learned of the reduction in his pay only when he received his first pay stub, which was not issued until April 18, 2014. *See* Avloni Decl., Ex. 10 (Razo Dep.) at ECF pp. 81:1-83:10 & *id.*, Ex. 11 (paystub for period ending April 13, 2014 issued April 18, 2014). He also testified Gutierrez did not inform him of a demotion prior to that date. Organ Decl., Ex. 9 at 241:8-242:13. In fact, Razo was so unaware of the demotion that he asked Holt about the reduced pay rate when he returned from leave on April 30, 2014, and his pay was returned to $38 per hour thereafter. A triable issue of fact thus exists as to whether Razo discovered the demotion and/or reduction in pay rate before April 9, 2014.[14]

TIMEC also argues Razo's interference claim based on any theory other than retaliation is barred for failure to exhaust because such theories were not addressed by Razo's DFEH charge. Def.'s Opp'n at 14-15. Specifically, TIMEC argues Razo has not exhausted his claim to the extent it is based on denial of medical leave, misclassification of leave, interference with his medical leave, and failure to notify Razo of his right to leave. *Id.* The DFEH charge refutes that argument, as it alleges Defendant "[d]enied family care of medical leave." DFEH charge at ECF p.16. Razo did not need to specify the exact nature of the charge, and could include "like or related" allegations in a subsequent civil lawsuit. *See Soldinger v. Nw. Airlines*, 51 Cal. App. 4th 345, 381 (1996) ("[A] DFEH charge is not intended as a limiting device. . . . Incidents not described in a DFEH charge can be included in the subsequently filed lawsuit if they would necessarily have been discovered by investigation of the charged incidents, i.e., if the allegations in the civil complaint were 'like or related' to those specified in the DFEH charge. . . . Essentially, if an investigation of what was charged in the administrative agency filing would necessarily uncover other incidents that were not charged, the latter incidents could be included in a subsequent civil

---

[14] In addition, Razo argues that the actual effects of the demotion did not occur until Razo's pay rate was actually reduced, which did not occur until the April 13, 2014 pay period, and that his claims did not accrue until that time. *See* Pl.'s Mot. at 10. TIMEC does not respond to that argument. *See* Def.'s Opp'n.

action." (internal citations, quotation marks, and modifications omitted)). Razo's allegations that TIMEC denied his medical leave, interfered with his medical leave, misclassified his medical leave, or failed to provide him the required information related to his medical leave are "like or related" to his DFEH claim asserting TIMEC denied his medical leave. If the DFEH had investigated what Razo had charged, it would have necessarily discovered the allegations concerning interference, misclassification, and denial. The claims asserted in the FAC are sufficiently related to pass muster.

TIMEC's Motion for Summary Judgment on the failure to exhaust issue is **DENIED**; Razo's Motion for Summary Judgment on the failure to exhaust administrative remedies issue and on TIMEC's Thirteenth Affirmative Defense (Failure to Exhaust Remedies under CBA) is **GRANTED**.

## D. Constructive Discharge

TIMEC also moves for summary judgment on Razo's constructive discharge claim. Def.'s Mot. at 24-25. The Court already rejected these arguments. *See* First Order re: Summ. J. at 37-38. It incorporates its reasoning here and once again **DENIES** TIMEC's Motion for Summary Judgment on this claim.

## E. Punitive Damages

In enacting Civil Code section 3294[15], the California "Legislature intended . . . to limit corporate punitive damage liability to those employees who exercise substantial independent authority and judgment over decisions that ultimately determine corporate policy." *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 573 (1999). "Managing agents" are those "who exercise substantial authority and judgment in their corporate decision-making so that their decisions ultimately determine corporate policy." *Id.* at 566-67. California law requires "proof of malice among corporate leaders . . . This is the group whose intentions guide corporate conduct. By so

---

[15] To hold a corporate entity liable for punitive damages, a plaintiff must establish "an officer, director, or managing agent of the corporation . . . had advance knowledge of the unfitness of the employee" whose conduct forms the basis of the claims "and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(b).

confining liability, the statute avoids punishing the corporation for malice of low-level employees which does not reflect the corporate 'state of mind' or the intentions of the corporate leaders." *Cruz v. Home Base*, 83 Cal. App. 4th 160, 167 (2000). Finally, the party seeking to obtain punitive damages must prove its entitlement to such damages by clear and convincing evidence. *See Tomaselli v. Transamerica Inc.*, 25 Cal. App. 4th 1269, 1288 n.14 (1994).

TIMEC argues Razo cannot obtain punitive damages as a matter of law because none of the employees Razo has identified exercises substantial authority and judgment in TIMEC's corporate decision-making. *See* Def.'s Mot. at 13-15. TIMEC supports its arguments with the Declaration of Donald Brown, who explains his duties at TIMEC during the relevant period, as well as the duties of Gutierrez, Holt, Cook, and Morgan. *See* Second Brown Decl., Dkt. No. 126. Teel also describes her duties at TIMEC. Second Teel Decl. ¶¶ 2-6.

In his Opposition, Razo argues that (1) TIMEC failed to meet its burden of production with regard to whether each TIMEC employee involved in this action was not a managing agent; (2) sufficient evidence exists for a jury to determine that Brown, Teel, Cook, and Holt were all managing agents of TIMEC; and (3) TIMEC ratified Gutierrez's conduct by retaining him as an employee after learning he had interfered with Razo's rights under CFRA. Pl.'s Opp'n at 9-12.

1.   Burden of Production

TIMEC satisfies its burden of production on summary judgment with the Second Brown and Second Teel Declarations. Brown declares that he oversees operations at different facilities where TIMEC operates; that he covers operations, support, safety, profit and loss accounts, back terms and conditions, and general oversight; and he reports directly to TIMEC President Adam Machon. Second Brown Decl. ¶¶ 2-3. Brown shares responsibility for ensuring compliance with TIMEC's policies and procedures with account managers, the HR regional manager, and the regional safety manager. *Id.* ¶ 3. He follows guidelines laid out in company policies and has "input on company policies to provide the perspective of operations in Northern California, but [he does] not decide what the company-wide policies are and [does] not create company-wide policies. . . . [He has] never set company-wide policies." *Id.* ¶ 5. Finally, Brown declares he did not terminate or approve Razo's termination, was not involved in approving or denying employee

26

leave for Razo, and is not involved in leave decisions related to employees at Razo's level. *Id.* ¶ 6.

In addition, Brown is familiar with the job requirements of Cook's role as Regional Human Resources Manager, as well as the scope of her job duties and authority in this role during the period at issue in this case. *Id.* ¶ 17. Brown declares Cook did not have the authority to create company-wide policies, could not independently make decisions that impacted the company at a local or regional level, but had to work alongside TIMEC operational personnel to do so. *Id.* ¶ 19.

Brown is also familiar with the job requirements and scope of authority of Morgan as staffing coordinator. *Id.* ¶ 20. Morgan assists TIMEC in administering various staffing functions and to assist employees by directing them to appropriate contacts and resources; she has no decision-making authority as it relates to personnel issues. *Id.* ¶¶ 21-22. Morgan cannot set company policy and cannot make decisions that create company policy. *Id.* ¶ 23.

Teel declares that, as Benefits Administrator, she assisted in the benefits and compensation management for her employer's subsidiaries, including TIMEC; her duties included sending and receiving leave-related documents, assisting in benefits enrollment and payroll deductions, providing data regarding employee benefits, and responding to employee inquiries. Second Teel Decl. ¶ 3. In 2014, Teel "did not have the authority to make final determinations as to whether or not an employee would be granted leave" but would process any necessary paperwork and answer questions as needed after Brian Wallace (then the Benefits & Compensation Manager) and Kitt Diloretti (then the VP of HR) made final determinations as to whether an employee would be granted leave. *Id.* ¶ 4. In 2014, Teel did not set policies for the company; her job "was limited to following the guidelines set forth by the company and obtaining approval from my superiors for any action affecting an employee." *Id.* ¶ 5. She has never had a role in making decisions relating to job assignments. *Id.* ¶ 6.

Without acknowledging the Second Brown and Teel Declarations, or explaining why they are deficient, Razo argues TIMEC has failed to meet its burden of production by "neglect[ing] to reveal the scope of duties for each of the potential managing agents, as well as their respective roles in Razo's demotion and constructive termination." Pl.'s Opp'n at 10. But that is precisely what the Second Brown and Teel Declarations, combined with the evidence TIMEC cites in its

Statement of Fact (Def.'s UMF at pp. 41-47), do.

2.    Managing Agents

Razo argues sufficient facts exist for a reasonable jury to determine that Brown, Teel, Cook, and Holt were managing agents of TIMEC. *See* Pl.'s Opp'n at 10-11.[16]  Razo does not identify the conduct for which a reasonable trier of fact could award punitive damages in connection with actions taken by each of these individuals.

a.    *Richard Holt*

Richard Holt was a site manager, whose responsibilities included controlling site expenditures and assets; ensuring safety procedures are followed; addressing payroll issues; interacting with clients; verifying third party estimates; and overseeing work groups for TIMEC at the Chevron Richmond facility.  Def.'s UMF Nos. 20-22.  He had no role in setting company-wide policies.  *Id.* No. 24.  He had no decision-making authority related to the creation of HR, operations, safety, or any other company policy.  *Id.* No. 25.

Razo nonetheless argues there is a triable issue whether Holt was a managing agent because he "appears to have similar responsibilities to the head of the distribution center in *Roby*" *v. McKesson*, 47 Cal. 4th 686 (2010).  Pl.'s Opp'n at 11.  Setting aside the vagueness and legal insufficiency of this statement, the defendants in *Roby* did not argue the two midlevel managers named by the plaintiff were not managing agents, and the Court *assumed* for purposes of the appeal that *at least one of the two of them* was.  *Roby*, 47 Cal. 4th at 715-16.  *Roby* therefore does not stand for the proposition that, as a matter of law, the head of a distribution center is a managing agent.  The Court finds there is no triable issue of fact that Holt was a managing agent for purposes of awarding punitive damages.

b.    *Kelly Teel*

Teel was a Benefits Administrator who assisted in managing benefits and compensation for Transfield subsidiaries, including TIMEC.  Second Teel Decl. ¶ 3; *see also* Def.'s UMF Nos. 26-27.  Her duties included sending and receiving leave-related documents, assisting in benefits

---

[16] Razo thus concedes that Gutierrez, Koutz, and Morgan are not managing agents on whose conduct he can rely to obtain punitive damages from TIMEC on a managing agent theory.

28

enrollment, account funding, providing relevant data to benefits administrators, and responding to employee inquiries. Second Teel Decl. ¶ 3; Def.'s UMF No. 31. She did not have authority to make final decisions whether an employee would be granted leave. Second Teel Decl. ¶ 4; Def.'s UMF No. 32. She did not set policies relating to obtaining and certifying leave, or any other company policy. Second Teel Decl. ¶ 5; Def.'s UMF No. 33. Her job was limited to following guidelines set by the company. Second Teel Decl. ¶ 5; Def.'s UMF No. 34.

Razo argues Teel should be considered a managing agent because "she worked directly with a vice-president of the company . . . and so her failure to provide adequate notice to Plaintiff can be attributed to the corporate level of the company." Pl.'s Opp'n at 11.

The California Supreme Court defines "managing agents" are those "who exercise substantial authority and judgment in their corporate decision-making so that their decisions ultimately determine corporate policy." *White*, 21 Cal. 4th at 566-67. The fact that Teel worked directly with a vice-president does not create a triable issue that she exercised substantial authority and judgment in corporate decision-making. Razo has not identified any evidence the vice-president in question had knowledge of Teel's "failure to provide adequate notice to Plaintiff" and cannot impute Teel's knowledge of her own failures to that vice-president. *See Cruz*, 83 Cal. App. 4th at 167 (California law requires "proof of malice among corporate leaders . . . This is the group whose intentions guide corporate conduct.").

The Court finds there is no triable issue of fact that Teel was a managing agent for purposes of awarding punitive damages.

### c. Kelley Cook

Cook was Regional HR Manager for TIMEC, and her role was limited to the Northern California region. Def.'s UMF Nos. 45, 49. No employees reported to her; she handled HR issues and complaints, supported operations and other staff in the region, handled union grievances, and performed other typical HR functions. *Id.* Nos. 46-48. Cook did not help implement medical leave policies. *Id.* No. 51. Cook gave input to others in the HR Department regarding HR policies but did not have the authority to create company-wide policies. *Id.* at No. 52 (Razo's facts in opposition do not contradict the material facts TIMEC asserts; Cook does not testify about the

type of input, the process that resulted in her providing input, or whether her input was accepted). She also had input in establishing safety programs and policies in two Northern California refineries. *Id.* Nos. 51-52; Pl.'s Cook Dep. at 210:11-211:24.

Razo argues a triable issue of fact exists because Cook "was a regional HR manager, much like the person found to be a managing agent in *Roby*." Pl.'s Opp'n at 11. The Court already explained why *Roby* is unhelpful to Razo for this proposition as to Teel; the same reasoning applies to Cook. Razo identifies no other evidence that Cook was a managing agent of TIMEC. The Court finds there is no triable issue of fact that Cook was a managing agent for purposes of awarding punitive damages.

### d. Donald Brown

Brown was TIMEC's VP of Operations, Northern California. Def.'s UMF No. 54. He oversaw operations at several California facilities, as well as two facilities in Utah; his job covered operations, support, safety, profit and loss accounts, and general oversight. *Id.* Nos. 55-56. Brown was the highest level TIMEC executive in Northern California; he reported to Adam Machon, TIMEC's President. *Id.* Nos. 57-58. Brown was not the ultimate decision-maker when it came to policies and procedures; he had to follow company guidelines that might mandate he include input from or work through the safety or HR departments. *Id.* Nos. 57-59 (including Plaintiff's response thereto). For instance, Brown "may make a recommendation" on "developing procedures for TIMEC employees in the region" and "if the recommendation is approved [by management and HR service team and the regional safety], they may elect to adapt that on a broader scale." Organ Decl., Ex. 25 (Pl.'s Brown Dep.) at 46:16-15. He also would have "some input" into policies affected employees in his region of TIMEC, but "[n]ot in all cases." *Id.* at 47:1-23. Brown also was responsible for creating a new safety policy that was eventually adopted by the company at the discretion of management. Pl.'s Resp. to Def.'s UMF No. 60 (citing Pl.'s Brown Dep. at 56:11-59:12). While Brown could propose policies and procedures that might be adopted by management, he did not set company-wide policy. Def.'s UMF No. 62.

Brown was not involved in approving or denying leave for Razo or any other employee at Razo's level; he had no knowledge, especially at a site level, whether an employee was taking

United States District Court
Northern District of California

protected leave: "My expectations are that they are following the guidelines and then I don't necessarily have to be in a loop." *Id.* No. 63; *see also* Pl.'s Brown Dep. at 143:7-21. Brown did not terminate or approve a termination for Razo; he learned from Cook about the facts surrounding Razo's demotion and separation from TIMEC after it had occurred, and asked whether TIMEC was "covered" if Razo quit. *Id.* No. 63; *see also* Organ Decl., Ex. 25 (Pl.'s Brown Dep.) at 131:1-23. Brown would have had to approve any change in Razo's pay. *Id.* at 143:22-144:14; *see also* Pl.'s UMF Nos. 59-64 & Def.'s Resp. thereto, Dkt. No. 146.

Razo argues Brown "clearly qualifies as a managing agent much like the regional manager in *White*." Pl.'s Opp'n at 11. The manager in *White* supervised "a significant aspect of [the employer's] business"; her supervisors "delegated most, if not all, of the responsibility for running these stores to her"; she had the ability to act independently to fire employees, although she consulted with the HR department before doing so; she exercised substantial discretionary authority over vital aspects of the company's business that included managing numerous stores on a daily basis and making significant decisions affecting both store and company policy; and in firing the plaintiff, she "exercised substantial discretionary authority over decisions that ultimately determined corporate policy in a most crucial aspect" of the employer's business. *White*, 21 Cal. 4th at 577. Razo identifies evidence that Brown, as a VP for the California Region, is the highest level executive in Northern California, and that Brown reports to President Machon, who assists him in making decisions at the regional level; sets guidelines at the facility level and on occasion provided input regarding company policies; covers several areas of responsibility; oversees between 500 and 4,000 employees; works with HR on training; is personally involved in decisions regarding recruiting, hiring and firing of employees; and helps develop procedures that may be adopted outside his region and has input on some company policies. Pl.'s Opp'n at 11 (citing Pl.'s UMF Nos. 54-62).

But none of the evidence Razo identifies creates a triable issue of fact whether Brown was a managing agent for TIMEC. That Brown was in a supervisory position over a large number of employees and had the power to hire or fire them does not "render [him] a managing agent" under California law. *CRST, Inc. v. Superior Court*, 11 Cal. App. 5th 1255, 1273 (2017) (internal

citations omitted).  "The key inquiry . . . concerns the employee's authority to change or establish corporate policy."  *Id.*; *see also White*, 21 Cal. 4th at 576-77.  "'Corporate policy' is the general principles which guide a corporation, or rules intended to be followed consistently over time in corporate operations, and thus a managing agent is one with substantial authority over decisions that set these general principles and rules."  *Cruz*, 83 Cal. App. 4th at 167-68 (internal quotation marks and modifications omitted)).  In his testimony and Second Declaration, Brown explains he did not have substantial authority over TIMEC corporate policy.  Razo offers no facts to rebut this evidence: none of the evidence Razo identifies in opposition creates a triable issue that, like the manager in *White*, Brown had substantial discretionary authority over decisions that ultimately determined TIMEC's corporate policy.

The Court finds Razo has not identified evidence creating a triable issue of fact that Brown was a managing agent for purposes of awarding punitive damages.

### 3.  Ratification

Razo argues punitive damages are available under a ratification theory.  Pl.'s Opp'n at 11-12.  To obtain punitive damages based on ratification by a corporate employer, Razo must establish a triable issue of fact exists that a managing agent of the corporation had advance knowledge and conscious disregard of the conduct.  *CRST*, 11 Cal. App. 5th at 1272; *see also Cruz*, 83 Cal. App. 4th at 167 (a corporate employer "cannot confirm and accept that which it does not actually know about").  Razo argues there is evidence that "Defendant retained Mr. Gutierrez as an employee after it learned of Razo's demotion and Mr. Gutierrez's failure to return Razo to his old job."  Pl.'s Opp'n at 12.  The Court already found Razo failed to create a triable issue that Brown, Cook, Holt, Morgan or Teel were managing agents for TIMEC.  Razo does not identify any other TIMEC employee who had actual knowledge of any wrongdoing by Gutierrez who was also a managing agent for TIMEC.  *See* FAC; *see also* Pl.'s Opp'n.

### 4.  Summary

Razo has not identified evidence creating a triable issue that any of the TIMEC employees he interacted with, or who played a role in the events at issue, was a managing agent for TIMEC.  Accordingly, the Court **GRANTS** TIMEC's Motion for Summary Judgment on the issue of

punitive damages.

## CONCLUSION

Based on the analysis above, the Court:

(1) **GRANTS** TIMEC's Motion as to punitive damages and otherwise **DENIES** it; and

(2) **GRANTS** Razo's Motion as to TIMEC's Thirteenth Affirmative Defense (failure to exhaust remedies under CBA), TIMEC's Fourteenth Affirmative Defense (preemption), TIMEC's use of fitness-for-duty certifications as a defense to adverse employment actions, and TIMEC's argument Plaintiff failed to exhaust administrative remedies timely, and otherwise **DENIES** it.

The Court vacated existing pretrial deadlines. The parties are **ORDERED** to attend a settlement conference with the Honorable Jacqueline S. Corley within 120 days of the date of this Order.

**IT IS SO ORDERED.**

Dated: November 3, 2017

_____
MARIA-ELENA JAMES
United States Magistrate Judge